**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **DEBORA J. JACKSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case number 4:12cv0933 TCM** |
| | ) |
| **CAROLYN W. COLVIN, Acting** | ) |
| **Commissioner of Social Security,**[1] | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application

of Debora Jackson (Plaintiff) for disability insurance benefits (DIB) under Title II of the

Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned United States

Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has

filed an opening brief and reply brief in support of her complaint; the Commissioner has filed

a brief in support of her answer.

## Procedural History

Plaintiff applied for DIB in February 2009, alleging a disability onset date of March

30, 2003, caused by back problems, carpal tunnel syndrome in both wrists, and rheumatoid

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security in February 2013 and
is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

arthritis in both wrists. (R.[2] at 101-03, 134.)  Her application was denied initially and after

a hearing held in March 2010 before Administrative Law Judge (ALJ) Michael D. Mance.

(Id. at 13-23, 27-55, 58-62.)  The Appeals Council denied Plaintiff's request for review,

thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.

(Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and James E. Israel, L.P.C., C.V.E., C.R.C.,[3]

testified at the administrative hearing.

At the beginning of the hearing, Plaintiff amended her alleged disability onset date to

June 16, 2008.[4]  (Id. at 129.)

Plaintiff testified that she was then fifty-one years old.  (Id. at 34.)  She lives with her

husband in a trailer.  (Id. at 34-35.)  Her husband works.  (Id. at 39.)  She has a General

Equivalency Degree (GED).  (Id. at 34.)

Plaintiff's last job was as a bartender.  (Id. at 35.)  This was in 2007 and 2008, and was

part-time.  (Id.)  Before that she had last worked in 2003.  (Id.)  There was a gap in her

---

[2]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

[3]L.P.C. is an abbreviation for Licensed Professional Counselor; C.V.E. is for Certified Vocational Evaluator; C.R.C. is for Certified Rehabilitation Counselor.

[4]An earlier application for DIB had been denied at the initial level in February 2006 and not pursued further.  (Id. at 131.)

earnings because she had been unable to work. (Id.) During that gap, there were several jobs she had worked at for only a brief time due to her back pain.[5] (Id. at 35-36.)

She is no longer working because she cannot find a job she can do. (Id. at 37.) She cannot sit or stand for a long period of time because of hand and back pain. (Id.) She cannot lift anything over five pounds because of her back problems. (Id.) This restriction was placed on her in 1979 by the doctor who treated her for a back injury. (Id.)

Asked what she does during the day, Plaintiff explained that she takes care of their house, i.e., general household chores, such as cleaning and laundry, and cooks. (Id. at 39-40.) She cannot grasp dishes tightly enough to wash them, and has to rest often while vacuuming. (Id. at 40.) She sometimes has trouble buttoning her clothes and tying her shoes. (Id.)

Plaintiff can walk no farther than a couple of blocks. (Id. at 42.) If she did not have to walk, she could stand for two or three hours at a time. (Id.) She could sit for approximately the same length before having to stand up and stretch. (Id.) When riding in a car, she has to stop approximately every two hours. (Id. at 43.) Sometimes, she has to lie down to relieve her back pain. (Id. at 45.) She has a traction set at home that she occasionally uses to relieve that pain. (Id.) Sometimes she uses the traction every three months; sometimes it is once a year. (Id.) In a typical week, she probably lies down two or three times to relieve the back pain. (Id. at 46.) There is no set time for how long she needs

---

[5]The attorney who represented Plaintiff had the administrative level explained at the beginning of the hearing that the alleged impairments listed on her DIB application were based on Plaintiff's interpretation of what she had been told by her doctors. (Id. at 33.)

to rest.  (Id.)  Her back pain is constant, but varies in intensity.  (Id.)  Problems with her hand require that she rests for approximately thirty to sixty minutes after washing dishes for ten minutes.  (Id.)  She sometimes has problems cooking and doing laundry because of her hands.  (Id.)  For instance, she has difficulties lifting a heavy skillet or peeling potatoes.  (Id.)

Plaintiff has not received any medical treatment because she does not have any insurance and cannot afford it.  (Id. at 40.)  She had gone to a clinic, Volunteers in Medicine, in July 2007, September 2007, and January 2009.  (Id. at 41.)  They were able only to give her medication for her pain and muscle spasms.  (Id.)  She takes Tylenol with codeine for the pain and Flexeril for the muscle spasms.  (Id.)  She is also taking an anti-depressant after losing seven members of her family.  (Id. at 41-42.)  Plaintiff has not seen a mental health professional for her depression.  (Id. at 47.)  She did not "feel that it was that bad."  (Id.)

Plaintiff smokes one-half pack of cigarettes a day.  (Id. at 43.)

Plaintiff further testified that she worked as "an expeditor."  (Id. at 44.)  When she had a scheduling job, she had to move totes around.  (Id.)  These weighed up to fifty pounds.  (Id.)  Asked how long she could stand before having to sit down, Plaintiff replied "[p]robably" no longer than three to four hours.  (Id.)

Mr. Israel testified as a VE.  He classified Plaintiff's past job doing electrical solder factory work and her job as a line lead worker as medium-strength and semi-skilled; as a bartender as light, semi-skilled; and as a scheduling supervisor as she described it as medium, semi-skilled and as generally performed as light, semi-skilled.  (Id. at 48-49.)

The ALJ asked him to assume a hypothetical person of Plaintiff's age, education, and work experience who is limited to the light exertional level. (Id. at 49.) This person can frequently climb stairs and ramps; can not climb ropes, ladders, and scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; can frequently, not constantly, do gross manipulation; and should avoid concentrated exposure to extreme cold, unprotected heights, and excessive vibration. (Id.) The VE replied that this person could perform only Plaintiff's past work as a scheduling supervisor as that job is defined in the *Dictionary of Occupational Titles* (DOT). (Id. at 50.)

If the hypothetical person is limited to light exertional level, as before, but can only occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps; can not climb ropes, ladders, and scaffolds; can frequently, not constantly, do gross manipulation; and should avoid concentrated exposure to extreme cold, unprotected heights, and excessive vibration, this person can still perform Plaintiff's past work as a scheduling supervisor as the job is defined in the DOT. (Id. at 50-51.)

If the hypothetical person also needs to frequently rotate positions, is limited to no more than occasional gross manipulation, and otherwise has the same limitations as the second hypothetical person, she will not be able to perform Plaintiff's past work, primarily because such work requires more than occasional handling. (Id. at 51.) Nor will there be any other jobs the person can perform given the her age and educational background. (Id.)

The VE testified that his information is consistent with that in the DOT "and its companion publications." (Id. at 52.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from health care providers, and assessments of her physical functional capacities.

When applying for DIB, Plaintiff 's attorney completed a Disability Report on her behalf.  (Id. at 133-38.)  Plaintiff is 5 feet tall and weighs 105 pounds.  (Id. at 133.)  Her impairments, see pages 1 to 2, supra, limit her ability to work by causing her constant back and wrist pain and by preventing her from standing or sitting for long periods of time, from lifting anything heavier than five pounds, and from gripping anything "very well."  (Id.) These impairments first limited her ability to work on March 30, 2003, and stopped her from working that same day.  (Id.)  She listed two jobs that she had held in the past fifteen years. (Id. at 134-36.)  The job she had held the longest was as an electrical solder.  (Id. at 135.) From 2001 to 2003, she had worked as a scheduling supervisor.  (Id.)  She described the requirements of the soldering job, but not of the scheduling supervisor job.  She had not seen any doctors or gone to any hospitals or clinics since November 2003.  (Id. at 136-37.)  Her only medication was Tylenol.  (Id. at 137.)

On a Work History Report, Plaintiff did describe the requirements of her scheduling supervisor job.  (Id. at 140-47.)  This job required that she walk for a total of one hour each day; stand for one hour; sit for six hours; handle, grab, or grasp big objects for four hours; reach for two hours; and write, type, or handle small objects for four hours.  (Id. at 142.)  She

did not have to carry anything.  (<u>Id.</u>)  The heaviest weight she lifted was less than ten pounds.  (<u>Id.</u> at 143.)

Plaintiff completed a Function Report.  (<u>Id.</u> at 152-59.)  Asked to describe what she does from when she awakes until she goes to bed at night, she reported that, after showering, she fixes breakfast, does the dishes, does laundry, if necessary, dusts "a little," makes the beds, has lunch, "get[s] something out for dinner," and does the dishes.  (<u>Id.</u> at 152.)  She cannot work in the yard or do deep cleaning, e.g., wash the windows or mop.  (<u>Id.</u> at 153.)  Sometimes, her back pain affects her sleep.  (<u>Id.</u>)  She has difficulty with buttons, brushing her hair, and using a curling iron.  (<u>Id.</u>)  She daily prepares the meals for herself and her husband.  (<u>Id.</u> at 154.)  These take approximately thirty minutes.  (<u>Id.</u>)  It takes two and one-half to three hours to do her household chores.  (<u>Id.</u>)  She drives a car, and shops for groceries once a week for one and one-half to two hours.  (<u>Id.</u> at 155.)  She does not have any hobbies, nor did she have before her impairments.  (<u>Id.</u> at 156.)  Once or twice a week, she talks on the telephone with her children or parents and visits her parents.  (<u>Id.</u>)  Because of her impairments, she cannot pick up her grandchildren, play with them, or attend their sporting events.  (<u>Id.</u> at 157.)  She follows written and spoken instructions very well.  (<u>Id.</u>)  Her impairments adversely affect her abilities to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and use her hands.  (<u>Id.</u>)  The farthest she can walk is three blocks before having to rest for a few minutes.  (<u>Id.</u>)  She finishes what she starts.  (<u>Id.</u>)  She gets along very well with authority figures.  (<u>Id.</u> at 158.)  She also handles stress and changes in routine very well.  (<u>Id.</u>)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 178-84.)  Beginning in May 2008, her pain, grip strength in her wrists, and range of motion in her wrists had become progressively worse.  (Id. at 179.)  The over-the-counter medication was not as effective as before.  (Id.)  She cannot stand for long periods of time, cannot bend at the waist, and cannot lift anything heavier than five pounds.  (Id.)  Her wrists were becoming numb more frequently.  (Id.)  Turning her wrists was becoming more painful.  (Id.)  She did not have any new illnesses or impairments.  (Id.)  Dr. David Brown prescribed Advil, Tylenol Arthritis, and Tylenol PM for her pain.  (Id. at 181.)  On other forms asking for information about medications and recent medical treatment, Plaintiff reported that she had seen Dr. Nancy Noel in November 2009 and had been prescribed Flexeril for muscle spasms, Wellbutrin for depression, prednisone for arthritis and back problems, and Tylenol with codeine for pain.  (Id. at 186-87.)

Plaintiff had reported annual earnings from 1981 to 2005, inclusive, 2007, and 2008.  (Id. at 120.)  Her earnings steadily increased from 1999 to 2003.  (Id.)  Her highest annual earnings were in 2003, $28,047.[6]  (Id.)  They dropped to $9,258 in 2004 and $128 in 2005.  (Id.)  She had no reported earnings in 2006.  (Id.)  In 2007, she earned $793; in 2008, she earned $2,025.  (Id.)

The medical records before the ALJ were, with the exception of those of Volunteers in Medicine, generated pursuant to Plaintiff's worker's compensation case or her DIB application.

---

[6]The amounts have been rounded to the nearest dollar.

The records from Volunteers in Medicine begin on January 19, 2009, when Plaintiff saw D. Dorrell, R.N., about a knot under her left arm. (Id. at 219.) Also, she was depressed, having lost seven family members in the past three months. (Id.) The nurse could not feel the knot. (Id.) Plaintiff was prescribed Wellbutrin to be taken daily for six weeks, at which time Plaintiff was to stop taking it. (Id.)

Plaintiff consulted Nancy Noel, M.D., with Volunteers in Medicine on November 23 for complaints of back pain that was an eight on a ten-point scale and radiated down her legs. (Id. at 218.) The pain was chronic, and had worsened over the past two months. (Id.) Typically, it flared up when the weather was cold and damp. (Id.) She was applying for disability. (Id.) She reported that she fractured her tailbone in 1979 and had spondylolisthesis. (Id.) She could not bend, nor could she sit or stand for any length of time. (Id.) She became stiff if she stayed in bed too long, and sometimes was unable to get out of bed. (Id.) On examination, she had a decreased range of motion in her lumbosacral spine. (Id.) Dr. Noel detected no radiculopathy. (Id.) Dr. Noel diagnosed acute and chronic back pain, and noted that the pain was "prob[ably] arthritic." (Id.) She prescribed Plaintiff Flexeril, Tylenol with codeine, prednisone, and Wellbutrin. (Id.) When Plaintiff telephoned in February 2010 for refills, a nurse informed her that she would need to make an appointment and should go to an emergency room if the pain was severe. (Id.)

The records relating to Plaintiff's worker's compensation claim begin when she consulted David Brown, M.D., with the Orthopedic Center of St. Louis in November 2003 about her left thumb. (Id. at 232.) She had had pain in the thumb for the past two months

after injuring it at work.  (Id.)  X-rays revealed arthritis in the thumb.  (Id.)  Dr. Brown recommended an injection; Plaintiff declined.  (Id.)  She was given a thumb splint and a prescription for a non-steroidal anti-inflammatory medication.  (Id.)  She was to return in one month.  (Id.)  She was released to return to work without restrictions.  (Id.)

When Plaintiff saw Dr. Brown again in February 2004 she had no tenderness at the base of the thumb.  (Id. at 231.)  Her symptoms were described as being improved.  (Id.)  She was "minimally symptomatic."  (Id.)

Plaintiff next saw Dr. Brown in November 2005, reporting increased pain at the base of her left thumb and some pain at the base of her right thumb.  (Id. at 228-29.)  On examination, she had "visible signs of osteoarthritis at the base of her left thumb."  (Id. at 228.)  Dr. Brown again recommended a steroid injection, thumb splint, and non-steroidal anti-inflammatory medication.  (Id.)  Dr. Brown explained that the cause of her pain was "a medical condition related to the natural aging process."  (Id. at 229.)  He released her to return to full duty with no restrictions.  (Id.)  His recommendations and release did not change after he saw Plaintiff again in December.  (Id. at 227.)

On February 14, 2006, Plaintiff reported to Dr. Brown that she was continuing to have pain at the base of her left thumb and was beginning to have pain at the dorsum of the left wrist and to have numbness and tingling in her fingertips.  (Id. at 225-26.)  Her grip strength in her left hand was eleven pounds and in her right hand was thirty-nine pounds.  (Id. at 225.)  Dr. Brown recommended she have a magnetic resonance imaging (MRI) of her left wrist to

evaluate the soft tissues in that hand and have nerve conduction studies.  (Id. at 226.)  As before, he released her to return to work without restrictions.  (Id.)

After undergoing the MRI, Plaintiff returned to Dr. Brown on February 28.  (Id. at 224.)  The MRI revealed osteoarthritic changes at the base of her left thumb and osteoarthritic changes at the lunocapitate articulation consistent with osteoarthritis.  (Id.)  Dr. Brown again discussed with Plaintiff his opinion that her pain was attributable to osteoarthritic changes and not to a work-related injury.  (Id.)

Also pursuant to her worker's compensation claim, Plaintiff was examined by Jerome F. Levy, M.D., in October 2004 and again in April 2006.  (Id. at 211-16.)  When seen by Dr. Levy in 2004, Plaintiff reported that she was having pain and intermittent numbness in her hands and wrists after doing hand-intensive work for the past two years.  (Id. at 214.)  Her hands were frequently swollen and increasingly weak.  (Id.)  On examination, she had tenderness in the dorsum of the left wrist and moderate discomfort with motion of both wrists, the left worse than the right.  (Id. at 215.)  The left biceps and forearm were one centimeter less in circumference than the right.  (Id.)  The left grip strength was weaker than the right.  (Id. at 215-16.)  Dr. Levy diagnosed Plaintiff with chronic strain and overuse syndrome in both wrists.  (Id. at 216.)

When she saw Dr. Levy in 2006, Plaintiff reported that she was continuing to have problems with both her wrists, including weakness.  (Id. at 211.)  She could not hold anything for long before pain in her hands caused her to drop the items.  (Id.)  The more swollen her hands were, the more painful.  (Id.)  She had had an MRI of her wrists a month earlier and

been told that she has arthritis in her left thumb and wrist.  (Id.)  On examination, Plaintiff

had moderate discomfort with movement of her left wrist and tenderness on compression of

the left wrist.  (Id. at 212.)  There was no joint instability or grating on motion of any joint.

(Id. at 213.)  Her left biceps were one centimeter less in circumference than her right; her left

forearm was one and one-half centimeter less in circumference than her right.  (Id.)  Her left

upper extremity was noticeably weaker than her left.  (Id.)  The strength of her left grip was

ten; the strength of her right grip was thirty.  (Id.)  She was right-handed.  (Id.)  She had

diminished sensation to pinprick on the tips of four fingers in her left hand.  (Id.)  Her deep

tendon reflexes were equal.  (Id.)  Phalen's and Tinel's signs were absent.[7]  (Id.)  Dr. Levy's

diagnosis was of chronic strain in both wrists; overuse syndrome in both wrists; and

osteoarthritis in her left hand.  (Id.)  He opined that she had a twenty-five percent permanent

partial disability in her left upper extremity at the wrist and a fifteen percent permanent

partial disability in her right upper extremity at the wrist.  (Id.)

Also before the ALJ was the report of Arjun Bhattacharya, M.D., who had examined

Plaintiff in April 2009 pursuant to her DIB application.  (Id. at 197-203, 205-06.)  At that

time, he had before him no medical records.  (Id. at 197.)  Plaintiff's chief complaints were

of pain and numbness in both wrists and of back problems.  (Id.)  She reported that she had

injured her hands at work; she had last worked in 2003.  (Id.)  The back pain had started in

---

[7]Tinel's and Phalen's tests are used in the diagnosis of carpal tunnel syndrome.  See Jonathan
Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel
(last visited September 9, 2013).  A Tinel's sign is present when tingling in the fingers is made worse
by tapping the median nerve along its course in the wrist.  Id.  A Phalen's sign is present when pushing
the back of the hands together causes the complained-of symptoms.  Id.

the 1970s after she lifted a bed. (Id.) The pain was concentrated in the lumbosacral area. (Id.) She further reported that she had no difficulty standing, sitting, and walking. (Id.) She also reported that she could only walk approximately two blocks and stand for approximately thirty minutes; she could not sit without discomfort. (Id.) She had difficulty bending and stooping. (Id.) Her sleep was irregular. (Id.) During the day, she watched television and did light housework. (Id.) She stated that she had been diagnosed with rheumatoid arthritis and carpal tunnel syndrome. (Id. at 198.) The pain, however, was in her ring and little fingers. (Id.) She did not have any numbness in her thumb, index, or middle fingers. (Id.) She had difficulty with fine movements; she dropped things. (Id.) She also had difficulty buttoning her clothes and holding a coffee cup. (Id.) She could not open a jar, and had to hold onto a skillet with both hands. (Id.) She smoked one-half pack of cigarettes a day, and occasionally drank alcohol. (Id.) She was 5 feet 1 inch tall and weighed 122 pounds. (Id.)

On examination, Plaintiff had a normal alignment of her back, but had discomfort on deep palpation over the lumbar, sacral, and coccygeal areas. (Id. at 199.) She had a reduced range of motion in her lumbar spine on flexion-extension and with lateral flexion. (Id. at 203.) She had a reduced range of motion in her hips due to back pain. (Id.) Straight leg raises were limited to thirty to forty degrees in a supine position on either side.[8] (Id. at 199, 203.) Straight leg raises were negative in a seated position. (Id. at 203.) There was

_____

[8]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

tenderness over the lower end of the ulnar at the wrist joint in both hands.  (<u>Id.</u> at 199.)

There was no evidence of carpal tunnel syndrome.  (<u>Id.</u>)  Phalen's and Tinel's signs were both

absent.  (<u>Id.</u>)  Her grip in both hands was 3/5 with weakness in the ring and little fingers.[9]

(<u>Id.</u>)  There was a "somewhat diminished sensation in the distribution of the ulnar nerve in

both hands."  (<u>Id.</u>)  She had a normal gait and no difficulty in getting on and off the

examining table and in moving about the room.  (<u>Id.</u>)  She had normal coordination in her

fingers, but complained of pain in both hands.  (<u>Id.</u>)  She had a reduced range of motion in

both wrists.  (<u>Id.</u> at 202.)  X-rays of her lumbosacral spine showed disc space narrowing at

L5-S1 with grade 2 spondylolisthesis and spondylosis defects.  (<u>Id.</u> at 205.)  An x-ray of her

right wrist was unremarkable.  (<u>Id.</u> at 206.)  Dr. Bhattacharya's impression was of back pain,

primarily in the lumbosacral and coccygeal areas, with decreased range of motion in both

lower extremities; of wrist pain, primarily over the ulnar aspect of the wrists joints; and of

weakness of the ring and middle fingers of both hands.  (<u>Id.</u> at 200.)

　　　Pursuant to her DIB application, Plaintiff was again evaluated in June 2010.  (<u>Id.</u> at

235-47.)  After summarizing the foregoing medical records, Alan H. Morris, M.D., listed

Plaintiff's chief complaints as low back pain and bilateral wrist and hand pain.  (<u>Id.</u> at 235-

36.)  Plaintiff explained that she had been intermittently wearing an over-the-counter back

brace since her custom brace was destroyed by a house fire in 1986.  (<u>Id.</u> at 236.)

Approximately every six months, her back pain flares up for two to three weeks, the most

---

[9]Dr. Bhattacharya also listed a grip strength of 4/5 on the Range of Motion Values form.  (<u>Id.</u> at 202.)

recently being in May 2010. (Id.) When that happens, she takes prednisone and uses a cane. (Id.) On a daily basis, she has constant pain and generally lies down for relief for two hours every day. (Id.) She can sit for thirty minutes, stand for twenty, and walk for fifteen. (Id.) She had been told in 1979 to limit her lifting to no more than five pounds. (Id.) Also during a flare-up of her back pain, Plaintiff's husband helps her dress and bathe. (Id.) She does light housework, but no vacuuming or lifting. (Id.) Because of her difficulties gripping things, she does not drive. (Id.) She has pain in both wrists. (Id.) She has been told she has carpal tunnel syndrome, but has not had surgery. (Id.) She has numbness in the fourth and fifth fingers of both hands. (Id.) She has braces for both wrists, which she wears for one to two weeks every two months. (Id. at 237.) She has difficulty holding objects and has pain when she tries to grip anything tightly. (Id.) She takes prednisone intermittently. (Id.) She can walk fifty feet without a cane, has a normal gait without a limp, and has a normal, erect stance. (Id.) On examination, she could do a tandem gait, could take a few steps on her heels, and refused to attempt toe walking and squatting because of back pain. (Id.) She could independently get on and off the examining table and get out of a chair. (Id.) She had "normal finger and hand control" and could "oppose the thumb to all digits." (Id.) She had a 4/5 grip bilaterally. (Id.) She had no muscle spasms. (Id. at 237-38.) She could forward flex to fifty degrees, extend to five degrees, and laterally bend to ten degrees. (Id. at 238, 247.) Straight leg raises were negative to ninety degrees when sitting and positive to sixty degrees when supine. (Id. at 238.) She could sit up from a supine position without support, but did complain of pain. (Id.) She had no atrophy in her hands, had normal strength in her

hands, and had a full range of motion in both wrists.  (Id. at 238, 246.)  There was a thickening and slight tenderness at the base of the left thumb and carpometacarpal joint on the left but not on the right.  (Id.)  She had intact sensation in her hands and fingers.  (Id.)  Dr. Morris's diagnosis was degenerative disc disease at L-5, S-1 with grade 2 spondylolisthesis and arthritis at the base of her left thumb.  (Id.)  He found no evidence of rheumatoid arthritis or of carpal tunnel syndrome.  (Id.)

Dr. Morris also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) after examining Plaintiff.  (Id. at 240-45.)  He assessed her as having the ability to occasionally lift and carry up to ten pounds.  (Id. at 240.)  At any one time and without interruption, she could sit for thirty minutes, stand for twenty, and walk for fifteen.  (Id. at 241.)  For a total during an eight-hour work day, she could sit for three hours, stand for two, and walk for one.  (Id.)  She did not need a cane to walk.  (Id.)  She was limited to only occasionally reaching, handling, fingering, and feeling with either hand.  (Id. at 242.)  She should never push or pull.  (Id.)  She was also limited to occasional use of either foot to operate foot controls.  (Id.)  She could occasionally balance and climb stairs and ramps, but should never crouch, crawl, kneel, stoop, or climb ropes, ladders, or scaffolds.  (Id. at 243.)  She should never be exposed to unprotected heights or moving mechanical parts and should not operate a motor vehicle.  (Id. at 244.)  She could perform such activities as shopping, using public transportation, and preparing meals.  (Id. at 245.)  She should not sort, handle, or use papers and  files.  (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2010, and had not engaged in substantial gainful activity during the period from her amended alleged onset date of June 16, 2008, through her date last insured. (<u>Id.</u> at 18.) The ALJ next found that, through the date she was last insured, Plaintiff had severe impairments of degenerative joint disease of the lumbar spine and arthritis in her wrists and thumbs. (<u>Id.</u>) Her depression was not severe because it did not cause more than a mild limitation in any of the three functional areas and did not cause any episodes of decompensation of any extended duration. (<u>Id.</u> at 19.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of listing-level severity. (<u>Id.</u>) Through the date last insured, Plaintiff had the residual functional capacity (RFC) to perform light work with additional limitations of being able to only occasionally climb ramps and stairs and of never climbing ladders, ropes, or scaffolds. (<u>Id.</u> at 20.) She was able to only occasionally balance, stoop, kneel, crouch, or crawl. (<u>Id.</u>) She could not constantly handle objects, but could do so frequently. (<u>Id.</u>) She must avoid concentrated exposure to extremely cold temperatures, excess vibrations, and unprotected heights. (<u>Id.</u>)

In reaching his RFC finding, the ALJ considered Plaintiff's allegations about the extent of the affect of her impairments on her ability to function and found them not to be fully credible. (<u>Id.</u> at 20-22.) The ALJ first noted that the intermittent medical care sought by Plaintiff was inconsistent with her complaints. (<u>Id.</u> at 21.) Recognizing that Plaintiff had explained the infrequency by a lack of finances, the ALJ further noted that there was no

evidence that Plaintiff had sought low-cost or no-cost treatment or that she had been denied treatment due to an inability to pay. (<u>Id.</u>) Also, Plaintiff continued to smoke. (<u>Id.</u>) Her daily activities suggested that she was not as limited as she described. (<u>Id.</u>) Although she testified that she had been limited in 1979 to lifting nothing heavier than five pounds, she had described her job as an electrical solder as requiring that she lift up to fifty pounds. (<u>Id.</u>) The ALJ noted that Dr. Morris had opined that Plaintiff should not lift or carry more than ten pounds, but found such opinion to be inconsistent with his own examination findings. (<u>Id.</u> at 21-22.)

The ALJ determined that with her RFC, Plaintiff was capable of performing her past relevant work as a scheduler as that job is described in the DOT. (<u>Id.</u> at 22.) She was not, therefore, disabled within the meaning of the Act at any time from June 16, 2008, through March 31, 2010. (<u>Id.</u>)

## <u>Legal Standards</u>

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep her from doing past relevant work.'" **Wagner v. Astrue**, 499 F.3d 842, 853 (8th Cir. 2007) (quoting Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)). If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as

adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) defining her past relevant work as light work; (2) including in his RFC findings that she could frequently perform gross manipulation when the medical records only supported a conclusion that she could occasionally perform such; and (3) discounting the Medical Source Statement (MSS) of Dr. Morris.

Past Relevant Work.  Plaintiff first argues that the ALJ erred by relying on the testimony of the VE that she could perform her job as a scheduler because that job was listed

in the DOT as "'closer to light.'"  (Pl.'s Brief at 8, 9, ECF No. 13; Pl.'s Reply Brief at 2, ECF No. 19.)  Plaintiff misapprehends the record.[10]

In response to a question by the ALJ about a hypothetical claimant who was "limited to performing *light* exertion level work," see Record at 49 (emphasis added), the VE replied that this claimant could perform Plaintiff's past relevant work as a scheduling supervisor, not as the she performed it, but as it was described in the DOT.  "The [DOT] definitions 'are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.'"  **Hillier v. S.S.A.**, 486 F.3d 359, 366 (8th Cir. 2007) (quoting Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)).  As noted by the Commissioner, the VE did not cite the DOT numbers for the job of scheduling supervisor. The Commissioner did cite two numbers, DOT 215.367-014, for a personnel scheduler, see DOT, 1991 WL 671906 (G.P.O. 1991), and DOT 221.367-026, for a line-up worker, see DOT, 1991 WL 672012 (G.P.O. 1991).  The first is sedentary work, see 1991 WL 671906, and the second is light work, see 1991 WL 672012.

The ALJ's reliance on the VE's testimony about how Plaintiff's past relevant work was defined in the DOT is not fatally undermined by the VE's failure to cite the two numbers.  In **Hulsey v. Astrue**, 622 F.3d 917, 921-23 (8th Cir. 2010), the Eighth Circuit Court of Appeals was able to meaningfully review a claimant's argument that she was unable to perform some unskilled work which was a part of the jobs cited by the VE.  In that case also, the VE had

---

[10]Plaintiff cites page 55 of the Record in support of her reference to "closer to light."  Page 55 is a Disability Determination and Transmittal denying Plaintiff's application.  After a thorough review of the VE's testimony, the Court could not locate the quoted phrase.

not specified the DOT codes for the occupations she had identified as being able to be performed by the claimant. The claimant, however, was able to cite to the six different DOT listings for the general occupation described by the VE, including to five DOT listings which did not conform to the demands of the job relied on by VE. **Id.** at 923. The Eighth Circuit found it "evident" that the VE "had in mind" the sixth DOT listing, which did include the demands required by the claimant's RFC. **Id.** Similarly, in the instant case, there are two DOT listings for scheduling positions cited by the VE which include the light exertional requirement specified by the ALJ in his hypothetical question or the more restrictive sedentary exertional requirement.

Residual Functional Capacity. Plaintiff next challenges the ALJ's conclusions about her RFC. These conclusions are that Plaintiff can perform light work with additional limitations of being able to frequently, but not constantly, handle objects and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (R. at 20.) She can never climb ladders, ropes, or scaffolds and has to avoid concentrated exposure to extremely cold temperatures, excess vibrations, and unprotected heights. (Id.)

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own

description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff contends that only an ability to occasionally handle objects was established, not, as the ALJ found, an ability to frequently do so. "'Frequent' means occurring from one-third to two-thirds of the time." Social Security Ruling 83-10, 1983 WL 31251, *6 (S.S.A. 1983).

As noted by Plaintiff, Dr. Levy diagnosed Plaintiff with chronic strain in both wrists and overuse syndrome and Dr. Brown diagnosed her with osteoarthritis.[11] As noted by the Commissioner, Drs. Levy's and Brown's treatment and evaluation of Plaintiff were pursuant to a worker's compensation claim and neither saw her after April 2006 – more than two years before her amended alleged disability onset date. After April 2006, in 2007 and 2008, Plaintiff worked part-time as a bartender. This job, as defined in the DOT, 312.474-010, requires frequent handling. See DOT, 1991 WL 672698 (G.P.O. 1991). And, although Plaintiff worked at this job part-time, she did not attribute the number of hours she worked or the duration of her employment to any difficulties with her wrists.

---

[11]Plaintiff states that Dr. Brown gave her injections in her thumb. The cited page, Record at 235, is the first page of Dr. Morris' report. Dr. Brown's records reflect that he recommended an injection; however, Plaintiff declined. (R. at 232.)

After her alleged disability onset date, Plaintiff sought medical treatment twice. The first time was in January 2009 and was for a knot under her left arm and depression. The second time was in November 2009 and was for back pain. See **Edwards v. Barnhart**, 314 F.3d 964, 967 (8th Cir. 2003) (finding that claimant's failure to seek regular medical care "seriously undermine[d] her case"). Plaintiff argues that the infrequency of her treatment is due to her lack of finances. She testified, however, that she had been treated twice in 2007 at the same clinic she attended in January 2009. She did not testify that she had ever been denied medical attention due to an inability to pay. Moreover, she continued to smoke at least one-half pack of cigarettes a day. See **Goff**, 421 F.3d at 792 (failure to take medication was relevant to credibility determination given lack of any evidence that failure was attributable to lack of finances); **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (claimant's argument that he could not afford medical care was appropriately discounted given lack of any evidence that he was denied low-cost or free medical care and evidence that he continued to smoke three packs of cigarettes a day).

Plaintiff cites the findings of Dr. Bhattacharya in support of her argument.[12] Dr. Bhattacharya found that Plaintiff had a "somewhat diminished sensation in the distribution of the ulnar nerve in both hands," a reduced range of motion in both wrists, a grip strength of 3/5 in both hands,[13] and weakness in her ring and little fingers. He also found that she had

---

[12]Her argument relying on Dr. Morris's findings is addressed below.

[13]But see note 9, supra.

normal coordination in her fingers. Fourteen months later, Dr. Morris found she had normal strength in both hands, no atrophy in either hand, and a full range of motion in both wrists.

"'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations.'"[14] **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (quoting Pearsall, 274 F.3d at 1217); accord **Perks v. Astrue**, 687 F.3d 1086, 1092 (8th Cir. 2012). "'[T]he burden of persuasion to . . . demonstrate RFC remains on the claimant.'" **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)).

In the instant case, the ALJ considered the medical records, including those of Dr. Morris, see discussion below, and Plaintiff's descriptions of her limitations, including her testimony and her application information, and concluded that she had the RFC to frequently, *but not constantly*, handle objects. This conclusion is supported by substantial evidence on the record as a whole, and Plaintiff has not carried her burden of persuading the Court otherwise.

Dr. Morris' Medical Source Statement. Dr. Morris reported on a MSS that Plaintiff was limited to only occasional use of her hands to reach, handle, finger, and feel. Plaintiff argues that the ALJ erred by not incorporating this more restrictive use in his RFC findings.

As noted by the Commissioner, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."

---

[14]The Court notes that Plaintiff does not challenge the ALJ's credibility assessment.

**Martise**, 641 F.3d at 927 (alteration in original) (internal quotations omitted). Nor is the ALJ required to rely on a physician's opinion when that opinion is inconsistent with the physician's examination notes, see **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009), or when that opinion is based on the claimant's "self-reported symptoms," **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011). See **Charles v. Barnhart**, 375 F.3d 777, 783-84 (8th Cir. 2004) (rejecting claimant's argument that ALJ erred by not giving greater weight to treating physician's opinion that she could not stand for longer than four hours in an eight-hour work day when that limitation was not supported by clinical and laboratory findings or by the physician's own treatment notes).

Dr. Morris's examination notes of Plaintiff reflect that she had normal strength in both hands, a full range of motion in both wrists, and intact sensation in her hands and fingers. She did not, as reported by Plaintiff, have carpal tunnel syndrome. Regardless, in his MSS he limited her to only occasional use of her hands and fingers. The reliance of this restriction on Plaintiff's own description of her limitations is reflected in other restrictions in the MSS. For instance, Plaintiff reported that she would sit for thirty minutes, stand for twenty, and walk for fifteen. These limitations were incorporated by Dr. Morris in his MSS. Plaintiff reported that she had to lie down for two hours every day. This requirement was incorporated by Dr. Morris in his MSS.

In concluding that Plaintiff could frequently handle objects, the ALJ gave more credence to Dr. Morris's examination findings than to his MSS conclusions. As explained above, this is not error. See **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012)

(finding that an ALJ does not err by not giving a physician's opinion about a claimant's RFC controlling weight when that opinion is "largely based on [the claimant's] subjective complaints").

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  19th  day of September, 2013.